101 F.3d 1392
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
ACME BUS CORP., Brookset Bus Corp., Baumann & Sons Buses,
Inc., Alert Coach Lines, Inc., A Single Employer,
Respondents.
 No. 95-4201.
 United States Court of Appeals,
Second Circuit.
 July 15, 1996.
 
 Frederick C. Havard, Supervisory Attorney, National Labor Relations Board, Washington, DC, for Petitioner.
 Alan B. Pearl, Pearl & MacKenzie, P.C., Westbury, NY, for Respondents.
 Present: MINER, JACOBS, PARKER, Circuit Judges.
 
 
 1
 UPON CONSIDERATION of this petition for enforcement of an order of the National Labor Relations Board, it is hereby
 
 
 2
 ORDERED, ADJUDGED, AND DECREED that the order be and it hereby is ENFORCED.
 
 
 3
 This cause came on to be heard on the transcript of record and was argued by counsel.
 
 
 4
 Petitioner National Labor Relations Board petitions for enforcement of an order of the Board finding that respondents Acme Bus Corp., Brookset Bus Corp., Baumann & Sons Buses, Inc., Alert Coach Lines, Inc. (together, the "Company") violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(1) and 158(a)(5).
 
 
 5
 The Company provides transportation services to school districts and the general public. On May 19, 1993, Local 868, International Brotherhood of Teamsters, AFL-CIO ("Local 868") petitioned the Board for certification as the collective bargaining representative of the Company's bus drivers. On May 28, 1993, Local 144, Service Employees International Union ("Local 144") filed a petition to represent all of the Company's employees. In June of 1993, the Board held a hearing on the petitions. At the hearing, Local 868 amended its petition to include District Lodge 15, International Association of Machinists and Aerospace Workers, AFL-CIO ("Lodge 15") as joint petitioners. Following the hearing, the Company moved to submit new evidence concerning the scheduling of the union representation election because approximately 235 of its employees were due to be laid off temporarily for the summer months. On June 30th, the Board's Regional Director denied the Company's request.
 
 
 6
 On July 1, 1993, the Regional Director directed that an election be held on July 30, 1993 for all "drivers, drivers' assistants, and mechanics" employed by the Company. Thereafter, the Company petitioned the Board for review of the Regional Director's decision to hold the election on July 30th, and the petition was denied.
 
 
 7
 On July 30, 1993, 735 of the 1151 eligible employees voted in the representation election. The election results were as follows: 404 votes were cast for Local 868 and Lodge 15 (together, the "Union"); 13 ballots were cast for Local 144; 281 ballots were cast against any union representation; 37 ballots were challenged; and four ballots were void.
 
 
 8
 The Company filed ten objections to the election based on, inter alia, the following conduct: (1) four days before the election, Local 144 sent to the Company's employees a leaflet falsely stating that the election had been cancelled; (2) the Regional Director scheduled the election on a date when many employees were unable to vote; and (3) Local 868 improperly offered to waive initiation fees so as to induce employees to sign union authorization cards. On October 8, 1993, the Regional Director issued a Supplemental Decision sustaining the Company's objection to Local 144's mailing of the leaflet. Accordingly, the Regional Director ordered that the July 30th election be set aside and ordered that a second election be held.
 
 
 9
 On March 2, 1994, the Board granted the Union's petition for review of the Regional Director's decision and remanded the case to the Regional Director with instructions to convene a hearing before a hearing officer to make further findings of fact, including the extent to which Local 144's leaflet had been disseminated. Following a five-day hearing, the hearing officer found that the Company had failed to demonstrate that the leaflet affected the outcome of the election. The hearing officer issued a report recommending that the objection be overruled and that the Union be certified. The Company petitioned the Board for review, and, on February 10, 1995, the Board issued its Decision and Certification of Representation and adopted the rulings of the hearing officer.
 
 
 10
 After the Company refused to bargain with the Union, the Union filed an unfair labor practice charge. The General Counsel issued a complaint alleging that the Company's refusal to bargain with the Union violated the Act. On June 20, 1995, the Board granted the General Counsel's motion for summary judgment, having found that the Company's refusal to bargain with the Union violated the Act. The Board ordered the Company to bargain with the Union upon its request and petitioned this Court for enforcement of its order.
 
 
 11
 "[T]he conduct of a representation election is a purely administrative function with which the court should not interfere absent the most glaring discrimination or abuse." NLRB v. Black Bull Carting Inc., 29 F.3d 44, 46 (2d Cir.1994). "[W]hen reviewing a request to overturn a Board decision refusing to set aside an election, we are limited to the narrow question of whether the Board abused its discretion in certifying the election." Rochester Joint Bd., Amalgamated Clothing & Textile Workers Union v. NLRB, 896 F.2d 24, 27 (2d Cir.1990). Moreover, we will not disturb the Board's factual findings unless they are not supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e).
 
 
 12
 The party seeking to set aside a union election has the burden of showing that the election was not conducted fairly. See Black Bull, 29 F.3d at 46. In order to meet this burden, "the challenger must come forward with evidence of actual prejudice resulting from the challenged circumstances," as opposed to evidence demonstrating "merely a possibility that the election was unfair." Id. (quotations omitted).
 
 
 13
 The Company contends that the Board should have set aside the election on the ground that Local 144's dissemination of leaflets four days before the election erroneously announcing the cancellation of the election had disenfranchised employees and thus affected the results of the election. We reject this contention.
 
 
 14
 We think that the Company failed to demonstrate that it was prejudiced by the dissemination of Local 144's leaflet. First of all, the hearing officer found that, at most, 70 leaflets were mailed to employees. Moreover, the Company only presented one witness who testified that she had received the leaflet and did not vote as a result of the erroneous information in the leaflet. The Company presented no other evidence demonstrating that any individual failed to vote as a result of the leaflet. Furthermore, after the leaflet was mailed, the Union, the Company, and the Board undertook various measures to notify employees that the leaflet incorrectly stated that the election had been cancelled. Accordingly, we think that the Company failed to demonstrate that the distribution of the leaflet affected the outcome of the election.
 
 
 15
 The Company also contends that Local 868 violated the principles set forth in NLRB v. Savair Manufacturing Co., 414 U.S. 270 (1973), by distributing a campaign leaflet stating: "There are absolutely no initiation fees for any employee on the Baumann bus campaign. Any new employees hired after the ratification of your contract will pay an initiation fee." We find this contention to be without merit.
 
 
 16
 In Savair, the Supreme Court held that a union's offer to waive initiation fees on the condition that employees sign union authorization cards was improper. However, the Court stated that a union may waive initiation fees for its new members if the waiver applies "not only to those who have signed up with the union before an election but also to those who join after the election." Id. at 272 n. 4.
 
 
 17
 We believe that the distribution of Local 868's leaflet did not violate Savair because the leaflet indicates that the waiver of initiation fees applies to employees who support Local 868 both before and after the election. The sentence in the leaflet stating that the initiation fee will be waived for anyone "on the Baumann bus campaign" is followed by a sentence stating that "[a]ny new employees hired after the ratification of your contract will pay an initiation fee." The latter sentence indicates that the offer is not limited to employees who support Local 868 in the election, but instead extends to employees who support Local 868 after the election and up until ratification of the contract.
 
 
 18
 The Company contends that the Board abused its discretion by scheduling the election for July 30, 1993. The Company argues that many eligible voters were unable to vote because they were on vacation or on temporary lay-off status during the month of July. We disagree. The Regional Director found that only approximately 20 percent of the Company's employees would be on vacation or on temporary lay-off status during the month of July. The Regional Director also found that those employees who were not working during the month of July still were eligible to vote in the election. Therefore, the decision to hold the election on July 30th did not deprive employees of an adequate opportunity to vote. See Beck Corp. v. NLRB, 590 F.2d 290, 293 (9th Cir.1978).
 
 
 19
 We have considered the Company's remaining contentions, and we find them all to be without merit.